UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EUGENIA CASE, | CASE NO. 1:16CV585 |
| Plaintiff, | JUDGE SARA LIOI |
| v. | Magistrate Judge George J. Limbert |
| NANCY A. BERRYHILL[1],<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE |
| Defendant. | |

Plaintiff Eugenia Case ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. In her brief on the merits, filed on September 14, 2016, Plaintiff asserts that the administrative law judge's ("ALJ") decision that Plaintiff was not disabled was not supported by substantial evidence. ECF Dkt. #18 at 6-14. Defendant filed a response brief on November 14, 2016. ECF Dkt. #20. Plaintiff did not file a reply brief.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I. FACTUAL AND PROCEDURAL HISTORY

On February 2, 2012, Plaintiff filed an application for DIB, alleging disability beginning February 10, 2011. ECF Dkt. #12 ("Tr.") at 20.[2] Plaintiff's claim was denied initially and upon reconsideration. *Id.* Plaintiff then requested a hearing, which was held on November 18, 2013. ECF

---

[1] On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

Dkt. #16 at 3. A supplemental hearing was held on March 3, 2014. Tr. at 34. On August 14, 2014, the ALJ issued a decision denying Plaintiff's DIB claim. *Id.* at 17. Subsequently, the Appeals Council denied Plaintiff's request for review. *Id.* at 5. Accordingly, the August 14, 2014, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's August 14, 2014, decision on March 10, 2016. ECF Dkt. #1. On September 14, 2016, Plaintiff filed a brief on the merits. ECF Dkt. #18. Defendant filed a response brief on November 14, 2016. ECF Dkt. #20. Plaintiff did not file a reply brief.

## II. RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A. Medical Evidence

Plaintiff began treating with William J. Petersilge, M.D., in October 2010. Tr. at 369. Dr. Petersilge indicated that Plaintiff was involved in a motor vehicle accident in 2005 during which she sustained a femoral shaft fracture and "apparently a sacral and pelvic fracture." *Id.* at 370. Continuing, Dr. Petersilge noted that following the motor vehicle accident, Plaintiff experienced persistent buttocks, lower back, and leg pain. *Id.* It was further noted by Dr. Petersilge that Plaintiff's femur fracture healed "uneventfully." *Id.*

In February 2011, Plaintiff visited Megan Brady, M.D., for numbness and pain in her left leg, and complaints of occasional hip and groin pain. Tr. at 466. Plaintiff informed Dr. Brady that she had been seen by multiple doctors in the past and had been told that she should not enroll in physical therapy. *Id.* Continuing, Plaintiff indicated that she had not participated in physical therapy since 2005 and that she was not interested in physical therapy. *Id.* Additionally, Plaintiff stated that she had participated in pain management in the past, but did not wish to return to pain management. *Id.* Plaintiff also indicated that she was able to walk and care for her children. *Id.*

On June 10, 2011, Plaintiff visited Dr. Petersilge for a follow-up appointment. Tr. at 303. Plaintiff complained of persistent pain following her pelvic and femoral fractures, and indicated that she was taking Tramadol, Flexeril, and Neurotin to help with her pain. *Id.* Additionally, Plaintiff stated that she was not interest in injections because of a bad reaction to an injection in the past. *Id.*

In January 2012, Plaintiff presented to an emergency room with complaints of increased pain in her neck, lower back, and left hip after a single-car accident that occurred when Plaintiff hit a patch of ice while traveling at approximately twenty-five miles per hour. Tr. at 348. Plaintiff was discharged in stable condition that same day, and prescribed medication for pain and muscle relaxation. *Id.* at 348-49.

Plaintiff visited Dr. Petersilge again on March 14, 2012. Tr. at 374. Dr. Petersilge noted that "[i]t appears at this point that [Plaintiff] seems to be using [him] as her pain management advice person," and that there was not much that he could offer to Plaintiff. *Id.* Dr. Petersilge indicated that Plaintiff stated that she received relief from the use of ibuprofen, as well as intermittent Flexeril and Gabapentin for her recurrent leg pain. *Id.* Further, Dr. Petersilge noted that Plaintiff "apparently never did go through with the aquatic therapy" that he had prescribed, so a new prescription for aquatic therapy was issued to Plaintiff. *Id.* Dr. Petersilge also issued a prescription for a lumbosacral corset. *Id.*

In May 2012, Plaintiff underwent a mental consultative evaluation. Tr. at 363-68. It was noted that Plaintiff presented with a constricted affect and depressed mood. The consultative examiner concluded that Plaintiff was experiencing depression due to her physical problems and the resulting financial problems. *Id.* at 366-67. Plaintiff was diagnosed with mood disorder due to her injuries sustained in the 2005 car accident, pain and numbness in her pelvis, leg, back, wrist, and neck, and depression. *Id.* at 366. Plaintiff visited Dr. Petersilge for a follow-up appointment in June 2012. Tr. at 375. Dr. Petersilge noted that Plaintiff's primary care physician did not feel comfortable prescribing medications for discomfort, and indicated that he would prefer that the primary care physician accept responsibility for handling Plaintiff's medications. *Id.*

Also in June 2012, state agency physician Leon D. Hughes, M.D., completed a physical residual functional capacity ("RFC") assessment. Tr. at 76-86. Dr. Hughes opined that Plaintiff was capable of performing a range of light work including: occasionally climbing ramps/stairs; never climbing ladders, ropes, or scaffolds; and occasionally balancing, stooping, kneeling, crouching, and

crawling. *Id.* State agency physician Diane Manos, M.D., affirmed Dr. Hughes' findings on October 30, 2012. *Id.* at 88-100.

On November 17, 2012, Plaintiff reported to an emergency room with complaints of pelvic pain and a potential syncopal episode. Tr. at 388. Plaintiff indicated that she experienced chronic left leg pain and chronic lower back pain from pelvic and femoral fractures sustained in 2005. *Id.* That same day, Plaintiff was discharged in stable condition and given a prescription for Vicodin for her pain. *Id.* at 389. In March 2013, Plaintiff reported to an emergency room complaining of right-sided and upper abdominal pain. Tr. at 526. Plaintiff was discharged in stable condition with a diagnosis of "undifferentiated abdominal pain, likely gastritis." *Id.* at 531.

In June 2013, Plaintiff visited Dr. Petersilge's office and was seen by Jessica Rahrig, PA-C. Tr. at 385. It was noted that Plaintiff continued to experience pain throughout her left leg, and that Plaintiff reported that her pain was well controlled with her medications. *Id.* Plaintiff's medications were refilled and she was given a packet of exercises that she could try to help relieve her hip pain. *Id.* Plaintiff was told to see her primary care physician and advised the he may be more adept to manage her long-term medication requirements. *Id.* X-rays of Plaintiff's left femur showed an "old healed fracture of the midshaft of the femur with [an] intramedullary rod bridging the old fracture site," and that the femur had healed in good position and alignment. Tr. at 425. The x-rays also showed mild degenerative osteoarthritis of the symphysis pubis. *Id.*

Plaintiff underwent a Functional Capacity Evaluation ("FCE") on November 15, 2013. Tr. at 412. It is noted in the FCE that Plaintiff reported continuous positional tolerance for standing for one hour, walking for thirty minutes, and sitting for one hour. *Id.* Plaintiff also reported the ability to stand for a total five hours in an eight-hour workday, walk for a total of two-hours in an eight-hour workday, and sit for six hours total in and eight-hour workday. *Id.* The FCE indicated that Plaintiff ambulated without assistive devices, and that her gait pattern displayed major deviations of decreased: left stance time; left heel strike; left knee and hip flexion in swing; lateral deviation of the pelvis; and counter-rotation of trunk. *Id.* at 414. Richard Wallis, the physical therapist performing the FCE, concluded that it was "clear" that Plaintiff did not have the physical ability to

perform the requirements of her past employment due to pain, weakness, range of motion deficits, and decreased positional tolerances. *Id.* at 415. Mr. Wallis opined that Plaintiff's performance in lifting tasks would place her in the physical demands classification of less than sedentary, and that Plaintiff should be considered to be disabled. *Id.*

In November 2013, Andrei Brateanu, M.D., opined that Plaintiff's physical capabilities were consistent with an ability to work at a less than sedentary level. Tr. at 930. Specifically, Dr. Brateanu opined that Plaintiff retained the ability to lift and/or carry less than ten pounds on an occasional basis, and sit, stand, or walk for less than two hours in an eight-hour workday. *Id.* Further, Dr. Brateanu opined that Plaintiff was disabled and unable to work. *Id.* at 930-31.

Plaintiff was evaluated by Kermit Fox, M.D., in December 2013 for lower back pain radiating into the lateral left lower limb and numbness throughout the lower limb. Tr. at 894. On examination, Plaintiff displayed weakness with dorsiflexion, plantar flexion, great toe extension on the left, decreased ankle range of motion, decreased sensation throughout the left lower limb distal to the knee, and positive neural tension signs on the left. *Id.* at 895. Dr. Fox ordered physical therapy and advised an aquatic exercise program. *Id.*

Plaintiff began physical therapy in January 2014, and on initial examination it was noted that Plaintiff displayed: decreased light touch sensation in the left lower leg; tenderness on palpation in the left S1 joint, left piriformis, IT band, and glut medius; and decreased flexibility in the lower back and hip extensors. Tr. at 978. Plaintiff reported that she retained the ability to climb stairs, but with difficulty. *Id.* at 979. The examiner's assessment noted: severe weakness of the entire left lower extremity/hip; that the left leg was shorter than the right leg by over two centimeters; pelvic girdle dysfunction; decreased hip flexibility, greater on the left; and high pain levels and impaired functioning. *Id.* At her second physical therapy appointment, on January 30, 2014, Plaintiff was observed to often use her upper extremities to manage her left lower extremity during bed mobility. *Id.* at 1002. It was also noted that Plaintiff continued to be limited by decreased flexibility. *Id.* During her third physical therapy appointment, Plaintiff presented with a slow, mildly antalgic gait and was tearful during some of the mat exercises. *Id.* at 1027. Plaintiff was provided a

transcutaneous electrical nerve stimulation ("TENS") unit in February 2014. *Id.* at 1044. Also in February 2014, in was anticipated by Plaintiff's physical therapist that she would need an extension of physical therapy. *Id.* at 1049.

In March 2014, after Plaintiff had completed her physical therapy regiment, she reported that her lower back pain was not improved or worsened by physical therapy. Tr. at 1097. Plaintiff described her back pain as constant, sharp, non-radiating, and as "6/10." *Id.* As for pain in her left thigh, Plaintiff described the pain as constant and stabbing, and rated the pain as "3/10." *Id.* at 1098. Plaintiff indicated that her left thigh pain worsened with activity, and was relieved with massage and medicine. *Id.* Additionally, Plaintiff stated that she noticed frequent swelling. *Id.* On examination, Plaintiff displayed tenderness of the paraspinal region from L2 to L5 bilaterally. *Id.* at 1101. The physical examination was noted as remarkable for weakness of the left lower limb and decreased sensation of the left lower limb. *Id.* at 1103. Plaintiff was diagnosed with chronic myofascial pain, sacroiliac dysfunction, and acquired leg length discrepancy. *Id.* at 1102-1103.

### B. Testimonial Evidence

The ALJ held a hearing on November 18, 2013. ECF Dkt. #16 ("Supp.Tr.") at 3-44. Plaintiff, her counsel, and a vocational expert ("VE") appeared for the hearing. *Id.* at 5. The ALJ indicated that there was a prior decision regarding Plaintiff's disability status, and then questioned the VE regarding Plaintiff's past work. *Id.* at 8-16. The VE testified that Plaintiff's past work included work as a hazardous material control management technician and a data entry general secretary. *Id.*

The ALJ then examined Plaintiff. Supp. Tr. at 16. Plaintiff testified that she could not remember the last time she went to the emergency room for pain in her leg, and that she had began refusing to go to the emergency room because her visits would only result in four-hour waits and a prescription. *Id.* at 17. Continuing, Plaintiff testified that she had no memory of the day of her minor car accident in 2012. *Id.* at 18-19. The ALJ requested a complete copy of the emergency room records generated a result of Plaintiff's visit, noting that her copy of the records was incomplete. *Id.* at 19. Plaintiff then testified that she visited the emergency room after she lost

-6-

consciousness in her bathroom. *Id.* at 20-21. Continuing, Plaintiff testified that a specialist had told her that a cyst was the cause of her pelvic pain. *Id.* at 22-23.

Plaintiff was then examined by her counsel. Supp. Tr. at 23. Regarding her left hip pain, Plaintiff testified that the pain began after a motor vehicle accident in 2005, and that she had a rod in her left leg. *Id.* Plaintiff stated that the pain traveled to her lower back and chest, and that she experienced the pain almost every day. *Id.* at 23-24. Continuing, Plaintiff testified that the level of the pain rose and fell depending on the day. *Id.* at 24. Plaintiff stated that she had difficulty sitting and could only sit for thirty minutes to an hour before needing to rise. *Id.* When asked about her prescription medications, Plaintiff testified that she was prescribed Tramadol, Flexeril, and Gabapentin, and that she did not take the medication everyday, instead taking the medications when she could not "stand the pain." *Id.* at 25. According to Plaintiff, she typically took the medications three to four times per week, and the medications did not completely alleviate her pain. *Id.* Plaintiff also testified that she intermittently experienced numbness in her left arm and cramps in her left thigh. *Id.*

Next, Plaintiff testified that she could not sleep through the night and typically woke up twice a night or in the early morning hours. Supp. Tr. at 27. Plaintiff stated that it was difficult to go to the grocery store or shop at the mall. *Id.* at 28. Continuing, Plaintiff testified that she sometimes felt her hip "popping" when she walked, and that it was hard for her to stand up from a seated position due to her hip dysplasia. *Id.* at 30-31. Plaintiff stated that she had injections in her hip in the past, and that the injections worsened her pain. *Id.* at 31-32. When asked about physical therapy, Plaintiff indicated that she was not currently in a physical therapy program and that she performed some stretching exercises at home. Supp. Tr. at 32. Plaintiff testified that the stretching exercises exacerbated her symptoms. *Id.*

After Plaintiff was questioned by her attorney, the ALJ stated that there were inconsistencies regarding Plaintiff's complaints of hip pain and Dr. Petersilge's 2010 opinion stating that he thought it was primarily Plaintiff's spine causing the pain. Supp. Tr. at 36. Plaintiff's attorney indicated that she was able to provide additional records expanding the record regarding Plaintiff's hip problems.

*Id.* at 40. Accordingly, the ALJ continued the hearing to allow Plaintiff's attorney to clarify the issues surrounding Plaintiff's hip pain. *Id.* at 43-44.

The continuation hearing was held on March 3, 2014. Tr. at 34. Plaintiff was first questioned by her counsel. *Id.* at 42. When asked about physical therapy, Plaintiff testified that she began physical therapy again about a month before the hearing, and that the physical therapy was helping, despite causing a lot of pain. *Id.* Continuing, Plaintiff stated that she was attending physical therapy two times per week, but was still feeling pain in her leg, lower back, hip, pelvis, and foot nearly all day long. *Id.* at 43. Plaintiff testified that some days were better than others in terms of her pain level, and that she did not need to take her pain medications on good days. *Id.* However, Plaintiff stated that on bad days she experienced so much pain that she almost needed to go to the emergency room. *Id.* Plaintiff estimated that she had three good days per week and four or five bad days per week. *Id.* at 43-44. According to Plaintiff's testimony, activities such as cleaning the house made the pain particularly bad. *Id.* at 44.

Next, Plaintiff testified that physical therapy had not improved her ability to sit. Tr. at 44. Plaintiff stated that she could sit for an hour with support on her left side before experiencing pain and becoming upset. *Id.* at 45-46. Continuing, Plaintiff testified that after an hour she had to lie down, stand up and walk, or lean forward to relieve the pressure on her back. *Id.* at 46. Plaintiff indicated that she was most comfortable when laying in bed on her right side, and that she needed to lay on her right side "like three, four times" on a bad day. *Id.* When asked about her sleeping habits, Plaintiff testified that she sometimes woke with pain in the night or woke in pain in the morning, and that some mornings were worse than others. *Id.* at 47.

Plaintiff testified that her condition worsened over the three years since her alleged onset date, and that her level of pain had remained consistent over these three years. Tr. at 48. Continuing, Plaintiff stated that she had about an equal number of good days and bad days since her alleged onset date. *Id.* Plaintiff testified that she had been to the hospital twice for abdominal pain, and that she had also been to the hospital once for bleeding cause by H. pylori. *Id.* at 49.

The VE was then examined by the ALJ. Tr. at 51. The ALJ asked the VE to consider a hypothetical individual similar to Plaintiff in age, education, and work history, and who could:

-8-

engage in light exertion; never climb ladders, ropes or scaffolds; occasionally perform all other potential postural requirements of a job; and sit and stand at will. *Id.* at 52. The VE testified that this hypothetical individual could perform Plaintiff's past work as a data entry clerk. *Id.* Continuing, the ALJ posed a second hypothetical individual with the same limitations, except that instead of being able to sit or stand at will, the hypothetical individual must be able to sit for one hour and then change positions to walking or standing. *Id.* The VE testified that this limitation did not change his answer as to the hypothetical individual's ability to work as a data entry clerk. *Id.* Next, the ALJ posed the same hypothetical individual, but included the limitations of light exertion, and standing and/or walking limited to four hours. Tr. at 53. The VE testified that this hypothetical individual could still perform work as a data entry clerk. *Id.* Continuing, the ALJ posed a hypothetical individual with the following limitations: sedentary exertion; never climbing ladders, ropes, or scaffold; and occasionally performing all other postural requirements. Tr. at 53. The VE testified that this hypothetical individual could still perform work as a data entry clerk. Tr. at 53.

The ALJ then asked the VE to consider all four of the previous hypothetical individuals, and add the limitation that each would be off task for ten percent of the day. *Id.* The VE testified that this additional limitation did not change his opinion as to any of the previous hypothetical individuals' ability to work as a data entry clerk. *Id.* Next, the ALJ modified the first hypothetical individual to have the following limitations: light exertion; never climbing ladders, ropes, or scaffolds; must be allowed to perform the essential job duties in either a seated or standing position; and no off-task time. *Id.* The VE indicated that the sit/stand portion of the limitations is not addressed in the guiding materials, but, based on his experience, the data entry clerk position could be performed because it was a sedentary position, and standing for significant portions of the day would become an issue of the employer's willingness to accommodate the limitation. *Id.* at 53-54. Continuing, the VE testified that there would be other jobs that could be performed with these limitations, citing the jobs of ticket seller, bench assembler, and parking lot attendant. *Id.* at 55.

The VE was then examined by Plaintiff's counsel. Tr. at 55. Plaintiff's counsel asked the VE if Plaintiff's past work could be performed by an individual with the following limitations:

-9-

lifting less than five pounds frequently and less than ten pounds occasionally; sitting for not more than one hour without interruption; standing for not more than half an hour without interruption; never climbing ladders, ropes, or scaffolds; occasionally climbing stairs or ramps; and requiring thirty-minute rest breaks twice a day in addition to what is customarily tolerated on an occasional basis. *Id.* at 56. Plaintiff's counsel added, "[s]o occasionally throughout the week, one-third of the week she would require an additional hour per day in rest breaks." *Id.* The VE testified that such an individual could not perform Plaintiff's past work or any other relevant work in the national economy. *Id.* Following this testimony, the ALJ concluded the hearing.

### III.     **RELEVANT PORTION OF THE ALJ'S DECISION**

After holding the hearings on November 18, 2013, and March 3, 2014, the ALJ issued a decision on August 14, 2014. Tr. at 17. The ALJ determined that Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2013, and that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of February 10, 2011, through the date last insured. *Id.* at 22. Continuing, the ALJ determined that through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; a fractured left femur with placement of a rod; degenerative joint disease in her left hip; and hip dysplasia. *Id.* The ALJ then determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 24.

After consideration of the record, the ALJ found that, through the date last insured, Plaintiff had the RFC to engage in light exertion, could never climb ladders, ropes, or scaffolds, and that "all other posturals were occasional." Tr. at 25. Further, the ALJ determined that Plaintiff "should have been in a job that allowed her to sit and stand at will." *Id.* Following the RFC finding, the ALJ stated that Plaintiff was capable of performing past relevant work as a data entry clerk, and that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. *Id.* at 27. In conclusion, the ALJ found that Plaintiff was not under a disability, as defined in the Social

Security Act, at any time from February 10, 2011, the alleged onset date, through June 30, 2013, the date last insured.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

-11-

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.     LAW AND ANALYSIS

Plaintiff asserts that the ALJ's decision finding her not disabled was not supported by substantial evidence. ECF Dkt. #18 at 6-14. Continuing, Plaintiff acknowledges that the prior ALJs decision must be adopted pursuant to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), unless there is new and material evidence supporting a different conclusion. *Id.* at 7-8. Plaintiff avers that the ALJ erred in adopting the findings of the prior ALJ since the record contained new and material evidence supporting a different conclusion. *Id.* at 8. First, Plaintiff asserts that her condition has worsened since February 2011, as evidenced by her increased pain and frequent trips to the emergency room due to severe pain. ECF Dkt. #18 at 8. Plaintiff also claims that the record contains new and material evidence of the severity of her condition, citing to a FCE and a statement from Dr. Brateanu, her treating physician. *Id.* at 9.

-12-

As for the FCE, Plaintiff asserts that an FCE prepared by Mr. Wallis, a physical therapist, revealed significant limitations in Plaintiff's ability to perform sustained standing, walking, and sitting.³ ECF Dkt. #18 at 9. Plaintiff notes that Mr. Wallis concluded that it was "clear" Plaintiff did not have the capacity to perform her former work, and that she "was limited to less than sedentary [RFC]." *Id.* Additionally, Plaintiff points to an opinion issued by Dr. Bateanu indicating that she was limited to a less than sedentary RFC. *Id.* at 10. Plaintiff argues that the ALJ's analysis of these two items was flawed. First, Plaintiff claims that the FCE provides valid objective evidence of Plaintiff's physical ability, and that it should not be discounted as Mr. Wallis is an "other source" per Social Security Ruling ("SSR") 06-03p. *Id.* Plaintiff also asserts that the ALJ's reliance on the lack of validity testing when preparing the FCE when discounting the FCE was baseless, indicating that Mr. Wallis would have noted if Plaintiff was not exerting her full effort during the testing. *Id.* at 10-11.

Plaintiff also contends that it was unreasonable for the ALJ to reject the FCE and Dr. Brateanu's opinion by stating that the reports were rendered four and a half months after Plaintiff's date last insured. ECF Dkt. #18 at 11. Continuing, Plaintiff asserts that these records are relevant, especially considering Plaintiff's chronic conditions. *Id.* at 11-12. Plaintiff also asserts that the ALJ's explanation for the rejection of Dr. Brateanu's opinion, namely that it was not supported by substantial evidence, is itself not supported by substantial evidence. *Id.* at 12. In support of this position, Plaintiff cites several pieces of medical evidence she believes the ALJ ignored when issuing her decision. *Id.* at 13 (citing Tr. at 301, 978, 894-95, 978-79). Plaintiff also argues that "the ALJ erred in rejecting the opinion of Dr. Brateanu as a treating source." *Id.* at 14.

Defendant contends that substantial evidence support the ALJ's RFC finding and evaluation of the medical source opinions. ECF Dkt. #20 at 9. In support of this position, Defendant asserts that the ALJ cited the following medical evidence: Plaintiff's femur fracture had healed uneventfully and her hip appeared to be in good shape with no degenerative changes by 2010; a lumbar spine

---

³Plaintiff refers to Mr. Wallis as "Mr. Wallace" in her brief. *See* ECF Dkt. #18 at 9-12.

-13-

diagnostic showed early facet arthrosis at L5-S1 and a small disc bulge, but no neurological compression; the disparity in length between Plaintiff's left and right legs was corrected with a simple shoe insert; although Plaintiff exhibited some slight tenderness of the left hip, lumbar tenderness, and mild tenderness in the left femur, she was consistently found to be neurologically intact and with no acute neurological deficits; Plaintiff exhibited a full range of motion and no edema; it was repeatedly noted that Plaintiff experienced no change or worsening of her symptoms; and that x-rays revealed only some mild degenerative osteoarthritis of Plaintiff's symphysis pubis, a well-healed pelvic ring injury, and an old, well-healed, internally-fixed fracture. *Id*. at 10 (citing 26, 300, 308, 312, 342, 349, 382, 385, 389, 424-25, 466, 528).

Additionally, Defendant states that the ALJ also discussed the fact that from Plaintiff's alleged onset date through her date last insured, she was routinely observed to be in no acute distress and only required conservative treatments. ECF Dkt. #20. Moreover, according to Defendant, Plaintiff frequently indicated that her pain was controlled with medication, refused to see a pain management specialist, refused to participate in aquatic therapy, and repeatedly denied experiencing muscle pain, joint pain, or back pain. *Id.* (citing Tr. at 26, 374, 382-83, 385-86, 466, 472, 491, 527).

Next, Defendant contends that the opinions of the non-examining state agency physicians, Drs. Hughes and Manos, were generally consistent with the ALJ's RFC findings, and that the ALJ properly afforded these opinions some weight insofar as they were consistent with the record evidence as a whole. ECF Dkt. #20 at 12. Continuing, Defendant asserts that substantial evidence supports the ALJ's decision of affording little weight to the opinions of Dr. Brateanu and Mr. Wallis as it is the ALJ's responsibility alone to determine whether Plaintiff was disabled under the Social Security Act, rather than the responsibility of a medical or "other" source. *Id.* Defendant further claims that the ALJ properly afforded lesser weight to these opinions as they were inconsistent with the medical record for the following reasons: Plaintiff was consistently found to be neurologically intact, with no neurological deficits and a full range of motion in her extremities; and Plaintiff admitted that she could stand for five hours, walk for two hours, and sit up for six hours during an eight-hour workday, and that she was able to care for her young children. *Id.* at 13 (citing 27, 349,

389, 412, 528). Finally, Defendant asserts that Dr. Brateanu's opinion is weak evidence as he simply circled answers on a checkbox form, and that Mr. Wallis, a physical therapist, was not an acceptable medical source and did not address whether he performed any validity testing to determine if Plaintiff was giving good effort during the examination. *Id.* at 13-14.

Plaintiff's arguments are without merit. Essentially, Plaintiff claims that the ALJ's decision was not supported by substantial evidence because she failed to properly consider the opinions issued by Dr. Brateanu and Mr. Wallis. Despite Plaintiff's contention, the ALJ's decision was supported by substantial evidence. The ALJ explained that Plaintiff's femoral injury from the 2005 motor vehicle accident had healed uneventfully by 2010, and also that Plaintiff's hip appeared to be in good shape and with no degenerative changes at that time. Tr. at 26. Continuing, the ALJ indicated that Plaintiff had early facet arthrosis in her lumber spine, but noted that there was no neurological compression. *Id.* The ALJ stated that the difference in the length of Plaintiff's legs was corrected with a simple shoe insert. *Id.* Next, the ALJ noted that Plaintiff suffered from tenderness at several locations and was observed to walk "somewhat stiffly and with a pronounced limp," but also indicated that she was consistently found to be neurologically intact and with no acute neurological deficits. *Id.* The ALJ stated that: Plaintiff exhibited full range of motion and no edema in her extremities; there was very little in the way of physical findings regarding her left leg; Plaintiff was observed to have no asymmetry of her lower extremities; there was no evidence of trochanteric bursitis; it was frequently noted that Plaintiff experienced no change or worsening of her symptoms; x-rays revealed only mild degenerative osteoarthritis of the pubis, a well-healed pelvic ring injury, and a well-healed, internally-fixed fracture; and it was noted that there was no reason to consider surgical intervention. *Id.* (internal citations omitted).

Further, the ALJ provided a thorough discussion of Plaintiff's credibility, citing routine observations of Plaintiff not being in acute distress, the conservative treatment measures, pain that was controlled with medication, and Plaintiff's refusal to undergo a number of medically recommended treatments. Tr. at 26. The ALJ also noted that Plaintiff had only sought emergency treatment twice in the relevant time period - once after a fall and once after a minor motor vehicle

-15-

accident.[4] *Id.* at 26-27. Additionally, the ALJ indicated that Plaintiff repeatedly denied muscle pain, joint pain, and/or back pain. *Id.* at 27. The ALJ also provided an analysis of each of the opinions provided by Plaintiff's physicians, and the FCE prepared by Mr. Wallis.

The ALJ afforded the FCE little weight. Tr. at 26. Specifically, the ALJ indicated that little weight was being afforded to Mr. Wallis' opinion because: he was a physical therapist, and thus not an "acceptable medical source"; the FCE did not address whether any validity test was performed; the FCE was prepared four and a half months after Plaintiff's date last insured, diminishing its evidentiary value; although Mr. Wallis found Plaintiff to be disabled, this is a determination left to Defendant; and the FCE was not supported by the objective evidence indicating that Plaintiff was consistently found to be neurologically intact, with no acute neurological deficiencies, demonstrated a full range of motion in her extremities, and admitted that she could stand for five hours, walk for two hours, and sit up for six hours in an eight-hour workday. *Id.*

Plaintiff asserts that Mr. Wallis is an "other source" under SSR 06-03p, and thus the FCE provided objective findings. ECF Dkt. #18 at 10. However, Plaintiff does not explain how this advances her argument. *Id.* The ALJ stated that Mr. Wallis is not an "acceptable medical source," which is correct according to SSR 06-03p. It is clear from the decision that the ALJ did consider Mr. Wallis' opinion, and Plaintiff provides no explanation as to how the ALJ did not properly consider the FCE due to Mr. Wallis being an "other source." There is no doubt that the ALJ considered the FCE as evidence, however, she properly chose to afford it less weight as it was not from an "acceptable medical source" and was inconsistent with the medical evidence in the record.

For these same reasons, the ALJ afforded Dr. Brateanu's opinion little weight. Tr. at 26. Dr. Brateanu's opinion was in the form of a two page document that was largely completed by circling the applicable information. *Id.* at 930-31. The ALJ explained the medical evidence in this case, as stated above, and then explained that little weight was being afforded to Dr. Brateanu's opinion for the following reasons: the form provided scant narrative to support his answers; the opinion was

---

[4]It appears that the ALJ excluded Plaintiff's hospital visit for bleeding caused by H. pylori. Presumably, the ALJ found that visit to be for an issue unrelated to the allegedly disabling impairments.

prepared four and a half months after Plaintiff's date last insured, diminishing its evidentiary value; although Dr. Brateanu found Plaintiff to be disabled, this is a determination left to Defendant; and the opinion was not supported by the objective evidence indicating that Plaintiff was consistently found to be neurologically intact, with no acute neurological deficiencies, demonstrated a full range of motion in her extremities, and admitted that she could stand for five hours, walk for two hours, and sit up for six hours in an eight-hour workday. *Id.* The ALJ considered Dr. Brateanu's opinion and provided good reasons for affording it less than controlling weight.

Plaintiff also briefly asserts that the ALJ "erred in rejecting the opinion of Dr. Brateanu as a treating source." ECF Dkt. #18 at 13. There is no further argument as to this contention beyond citations to Sixth Circuit case law explaining the treating physician rule. *Id.* Plaintiff appears to assert that the ALJ should have handled Dr. Brateanu's opinion pursuant to the treating physician rule, and erred by not handling the opinion pursuant to the rule. In her brief, Plaintiff refers to Dr. Brateanu as a treating physician, but does not describe any treating relationship, citing only to the two-page opinion discussed above. *See id.* at 4, 9. The ALJ does not make it clear whether Dr. Brateanu was considered a treating physician. *See* Tr. at 26. In any event, and assuming that Plaintiff could establish that Dr. Brateanu was a treating physician, the ALJ provided "good reasons" for discounting Dr. Bateanu's opinion, and thus the opinion could have been properly discounted whether it came from a treating physician or non-treating physician.[5]

---

[5]An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be

-17-

For these reasons, the ALJ's decision was supported by substantial evidence. The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole*, 661 F.3d at 937 (internal citation omitted). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. Since the ALJ's decision was supported by substantial evidence, the undersigned recommends that the Court affirm the decision.

## VII.     CONCLUSION AND RECOMMENDATION

For the above stated reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

Date:  March 6, 2017              */s/George J. Limbert*
                                                   GEORGE J. LIMBERT
                                                   UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

---

justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).